(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BUCKLEW *v.* PRECYTHE, DIRECTOR, MISSOURI DEPARTMENT OF CORRECTIONS, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 17–8151.  Argued November 6, 2018—Decided April 1, 2019

In *Baze* v. *Rees*, 553 U. S. 35, a plurality of this Court concluded that a State's refusal to alter its execution protocol could violate the Eighth Amendment only if an inmate first identified a "feasible, readily implemented" alternative procedure that would "significantly reduce a substantial risk of severe pain."  *Id.*, at 52.  A majority of the Court subsequently held *Baze*'s plurality opinion to be controlling.  See *Glossip* v. *Gross*, 576 U. S. ___.

Petitioner Russell Bucklew was convicted of murder and sentenced to death.  The State of Missouri plans to execute him by lethal injection using a single drug, pentobarbital.  Mr. Bucklew presented an as-applied Eighth Amendment challenge to the State's lethal injection protocol, alleging that, regardless whether it would cause excruciating pain for *all* prisoners, it would cause *him* severe pain because of his particular medical condition.

The District Court dismissed his challenge.  The Eighth Circuit, applying the *Baze-Glossip* test, remanded the case to allow Mr. Bucklew to identify a feasible, readily implemented alternative procedure that would significantly reduce his alleged risk of pain.  Eventually, Mr. Bucklew identified nitrogen hypoxia, but the District Court found the proposal lacking and granted the State's motion for summary judgment.  The Eighth Circuit affirmed.

*Held*:

1. *Baze* and *Glossip* govern all Eighth Amendment challenges, whether facial or as-applied, alleging that a method of execution inflicts unconstitutionally cruel pain.  Pp. 8–20.

(a) The Eighth Amendment forbids "cruel and unusual" methods of capital punishment but does not guarantee a prisoner a painless

death. See *Glossip*, 576 U. S., at ___. As originally understood, the Eighth Amendment tolerated methods of execution, like hanging, that involved a significant risk of pain, while forbidding as cruel only those methods that intensified the death sentence by "superadding" terror, pain, or disgrace. To establish that a State's chosen method cruelly "superadds" pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason. *Baze*, 553 U. S., at 52; *Glossip*, 576 U. S., at ___. And *Glossip* left no doubt that this standard governs "all Eighth Amendment method-of-execution claims." *Id.*, at ___. *Baze* and *Glossip* recognized that the Constitution affords a "measure of deference to a State's choice of execution procedures" and does not authorize courts to serve as "boards of inquiry charged with determining 'best practices' for executions." *Baze,* 553 U. S., at 51–52. Nor do they suggest that traditionally accepted methods of execution are necessarily rendered unconstitutional as soon as an arguably more humane method becomes available. Pp. 8–14.

(b) Precedent forecloses Mr. Bucklew's argument that methods posing a "substantial and particular risk of grave suffering" when applied to a particular inmate due to his "unique medical condition" should be considered "categorically" cruel. Because distinguishing between constitutionally permissible and impermissible degrees of pain is a *necessarily* comparative exercise, the Court held in *Glossip*, identifying an available alternative is "a requirement of all Eighth Amendment method-of-execution claims" alleging cruel pain. 576 U. S., at ___. Mr. Bucklew's argument is also inconsistent with the original and historical understanding of the Eighth Amendment on which *Baze* and *Glossip* rest: When it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment superadds pain well beyond what's needed to effectuate a death sentence. And answering that question has always involved a comparison with available alternatives, not an abstract exercise in "categorical" classification. The substantive meaning of the Eighth Amendment does not change depending on how broad a remedy the plaintiff chooses to seek. Mr. Bucklew's solution also invites pleading games, and there is little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative. Pp. 14–20.

2. Mr. Bucklew has failed to satisfy the *Baze-Glossip* test. Pp. 20–28.

(a) He fails for two independent reasons to present a triable question on the viability of nitrogen hypoxia as an alternative to the

State's lethal injection protocol. First, an inmate must show that his proposed alternative method is not just theoretically "feasible" but also "'readily implemented,'" *Glossip*, 576 U. S., at \_\_\_–\_\_\_. This means the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly. Mr. Bucklew's proposal falls well short of that standard. He presented no evidence on numerous questions essential to implementing his preferred method; instead, he merely pointed to reports from correctional authorities in other States indicating the need for additional study to develop a nitrogen hypoxia protocol. Second, the State had a "legitimate" reason for declining to switch from its current method of execution as a matter of law, *Baze*, 553 U. S., at 52, namely, choosing not to be the first to experiment with a new, "untried and untested" method of execution. *Id.*, at 41. Pp. 20–22.

(b) Even if nitrogen hypoxia were a viable alternative, neither of Mr. Bucklew's theories shows that nitrogen hypoxia would significantly reduce a substantial risk of severe pain. First, his contention that the State may use painful procedures to administer the lethal injection, including forcing him to lie flat on his back (which he claims could impair his breathing even before the pentobarbital is administered), rests on speculation unsupported, if not affirmatively contradicted, by the record. And to the extent the record is unclear, he had ample opportunity to conduct discovery and develop a factual record concerning the State's planned procedures. Second, Mr. Bucklew contends that while either method will cause him to experience feelings of suffocation for some period of time before he is rendered fully unconscious, the duration of that period will be shorter with nitrogen than with pentobarbital. But nothing in the record suggests that he will be capable of experiencing pain for significantly more time after receiving pentobarbital than he would after receiving nitrogen. His claim to the contrary rested on his expert's testimony regarding a study of euthanasia in horses that everyone now agrees the expert misunderstood or misremembered. Pp. 23–28.

883 F. 3d 1087, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and KAVANAUGH, JJ., joined. THOMAS, J., and KAVANAUGH, J., filed concurring opinions. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined as to all but Part III. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 17–8151

———————

## RUSSELL BUCKLEW, PETITIONER *v.* ANNE L. PRECYTHE, DIRECTOR, MISSOURI DEPARTMENT OF CORRECTIONS, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 1, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

Russell Bucklew concedes that the State of Missouri lawfully convicted him of murder and a variety of other crimes. He acknowledges that the U. S. Constitution permits a sentence of execution for his crimes. He accepts, too, that the State's lethal injection protocol is constitutional in most applications. But because of his unusual medical condition, he contends the protocol is unconstitutional as applied to him. Mr. Bucklew raised this claim for the first time less than two weeks before his scheduled execution. He received a stay of execution and five years to pursue the argument, but in the end neither the district court nor the Eighth Circuit found it supported by the law or evidence. Now, Mr. Bucklew asks us to overturn those judgments. We can discern no lawful basis for doing so.

## I

### A

In 1996, when Stephanie Ray announced that she wanted to end their relationship, Mr. Bucklew grew violent. He cut her jaw, punched her in the face, and threatened her

with a knife. Frightened to remain in the home they had shared, Ms. Ray sought refuge with her children in Michael Sanders' nearby residence. But then one night Mr. Bucklew invaded that home. Bearing a pistol in each hand, he shot Mr. Sanders in the chest; fired at Mr. Sanders' 6-year-old son (thankfully, he missed); and pistol-whipped Ms. Ray, this time breaking her jaw. Then Mr. Bucklew handcuffed Ms. Ray, drove her to a secluded spot, and raped her at gunpoint. After a trooper spotted Mr. Bucklew, a shootout followed and he was finally arrested. While all this played out, Mr. Sanders bled to death. As a coda, Mr. Bucklew escaped from jail while awaiting trial and attacked Ms. Ray's mother with a hammer before he could be recaptured.

After a decade of litigation, Mr. Bucklew was seemingly out of legal options. A jury had convicted him of murder and other crimes and recommended a death sentence, which the court had imposed. His direct appeal had proved unsuccessful. *State* v. *Bucklew*, 973 S. W. 2d 83 (Mo. 1998), cert. denied, 525 U. S. 1082 (1999). Separate rounds of state and federal post-conviction proceedings also had failed to yield relief. *Bucklew* v. *State*, 38 S. W. 3d 395 (Mo.), cert. denied, 534 U. S. 964 (2001); *Bucklew* v. *Luebbers*, 436 F. 3d 1010 (CA8), cert. denied, 549 U. S. 1079 (2006).

## B

As it turned out, though, Mr. Bucklew's case soon became caught up in a wave of litigation over lethal injection procedures. Like many States, Missouri has periodically sought to improve its administration of the death penalty. Early in the 20th century, the State replaced hanging with the gas chamber. Later in the century, it authorized the use of lethal injection as an alternative to lethal gas. By the time Mr. Bucklew's post-conviction proceedings ended, Missouri's protocol called for lethal injections to be carried

out using three drugs: sodium thiopental, pancuronium bromide, and potassium chloride. And by that time, too, various inmates were in the process of challenging the constitutionality of the State's protocol and others like it around the country. See *Taylor* v. *Crawford*, 457 F. 3d 902 (CA8 2006); Note, A New Test for Evaluating Eighth Amendment Challenges to Lethal Injections, 120 Harv. L. Rev. 1301, 1304 (2007) (describing flood of lethal injection lawsuits around 2006 that "severely constrained states' ability to carry out executions"); Denno, The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty, 76 Ford. L. Rev. 49, 102–116 (2007).

Ultimately, this Court answered these legal challenges in *Baze* v. *Rees*, 553 U. S. 35 (2008). Addressing Kentucky's similar three-drug protocol, THE CHIEF JUSTICE, joined by JUSTICE ALITO and Justice Kennedy, concluded that a State's refusal to alter its lethal injection protocol could violate the Eighth Amendment only if an inmate first identified a "feasible, readily implemented" alternative procedure that would "significantly reduce a substantial risk of severe pain." *Id.*, at 52. JUSTICE THOMAS, joined by Justice Scalia, thought the protocol passed muster because it was not intended "to add elements of terror, pain, or disgrace to the death penalty." *Id.*, at 107. JUSTICE BREYER reached the same result because he saw no evidence that the protocol created "a significant risk of unnecessary suffering." *Id.*, at 113. And though Justice Stevens objected to the continued use of the death penalty, he agreed that petitioners' evidence was insufficient. *Id.*, at 87. After this Court decided *Baze*, it denied review in a case seeking to challenge Missouri's similar lethal injection protocol. *Taylor* v. *Crawford*, 487 F. 3d 1072 (2007), cert. denied, 553 U. S. 1004 (2008).

But that still was not the end of it. Next, Mr. Bucklew and other inmates unsuccessfully challenged Missouri's protocol in state court, alleging that it had been adopted in

contravention of Missouri's Administrative Procedure Act. *Middleton* v. *Missouri Dept. of Corrections*, 278 S. W. 3d 193 (Mo.), cert. denied, 556 U. S. 1255 (2009). They also unsuccessfully challenged the protocol in federal court, this time alleging it was pre-empted by various federal statutes. *Ringo* v. *Lombardi*, 677 F. 3d 793 (CA8 2012). And Mr. Bucklew sought to intervene in yet another lawsuit alleging that Missouri's protocol violated the Eighth Amendment because unqualified personnel might botch its administration. That lawsuit failed too. *Clemons* v. *Crawford*, 585 F. 3d 1119 (CA8 2009), cert. denied, 561 U. S. 1026 (2010).

While all this played out, pressure from anti-death-penalty advocates induced the company that manufactured sodium thiopental to stop supplying it for use in executions. As a result, the State was unable to proceed with executions until it could change its lethal injection protocol again. This it did in 2012, prescribing the use of a single drug, the sedative propofol. Soon after that, Mr. Bucklew and other inmates sued to invalidate this new protocol as well, alleging that it would produce excruciating pain and violate the Eighth Amendment on its face. After the State revised the protocol in 2013 to use the sedative pentobarbital instead of propofol, the inmates amended their complaint to allege that pentobarbital would likewise violate the Constitution.

## C

Things came to a head in 2014. With its new protocol in place and the necessary drugs now available, the State scheduled Mr. Bucklew's execution for May 21. But 12 days before the execution Mr. Bucklew filed yet another lawsuit, the one now before us. In this case, he presented an as-applied Eighth Amendment challenge to the State's new protocol. Whether or not it would cause excruciating pain for *all* prisoners, as his previous lawsuit alleged, Mr.

Bucklew now contended that the State's protocol would cause *him* severe pain because of his particular medical condition. Mr. Bucklew suffers from a disease called cavernous hemangioma, which causes vascular tumors— clumps of blood vessels—to grow in his head, neck, and throat. His complaint alleged that this condition could prevent the pentobarbital from circulating properly in his body; that the use of a chemical dye to flush the intravenous line could cause his blood pressure to spike and his tumors to rupture; and that pentobarbital could interact adversely with his other medications.

These latest protocol challenges yielded mixed results. The district court dismissed both the inmates' facial challenge and Mr. Bucklew's as-applied challenge. But, at Mr. Bucklew's request, this Court agreed to stay his execution until the Eighth Circuit could hear his appeal. *Bucklew* v. *Lombardi*, 572 U. S. 1131 (2014). Ultimately, the Eighth Circuit affirmed the dismissal of the facial challenge. *Zink* v. *Lombardi*, 783 F. 3d 1089 (en banc) (*per curiam*), cert. denied, 576 U. S. ___ (2015). Then, turning to the asapplied challenge and seeking to apply the test set forth by the *Baze* plurality, the court held that Mr. Bucklew's complaint failed as a matter of law to identify an alternative procedure that would significantly reduce the risks he alleged would flow from the State's lethal injection protocol. Yet, despite this dispositive shortcoming, the court of appeals decided to give Mr. Bucklew another chance to plead his case. The court stressed that, on remand before the district court, Mr. Bucklew had to identify "at the earliest possible time" a feasible, readily implemented alternative procedure that would address those risks. *Bucklew* v. *Lombardi*, 783 F. 3d 1120, 1127–1128 (2015) (en banc).

Shortly after the Eighth Circuit issued its judgment, this Court decided *Glossip* v. *Gross*, 576 U. S. ___ (2015), rejecting a challenge to Oklahoma's lethal injection proto-

col. There, the Court clarified that THE CHIEF JUSTICE's plurality opinion in *Baze* was controlling under *Marks* v. *United States*, 430 U. S. 188 (1977). In doing so, it reaffirmed that an inmate cannot successfully challenge a method of execution under the Eighth Amendment unless he identifies "an alternative that is 'feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain.'" 576 U. S., at ___–___ (slip op., at 12–13). JUSTICE THOMAS, joined by Justice Scalia, reiterated his view that the Eighth Amendment "prohibits only those methods of execution that are deliberately designed to inflict pain," but he joined the Court's opinion because it correctly explained why petitioners' claim failed even under the controlling opinion in *Baze*. *Glossip*, 576 U. S., at ___ (concurring opinion) (slip op., at 1) (internal quotation marks and alterations omitted).

D

Despite the Eighth Circuit's express instructions, when Mr. Bucklew returned to the district court in 2015 he still refused to identify an alternative procedure that would significantly reduce his alleged risk of pain. Instead, he insisted that inmates should have to carry this burden only in facial, not as-applied, challenges. Finally, after the district court gave him "one last opportunity," App. 30, Mr. Bucklew filed a fourth amended complaint in which he claimed that execution by "lethal gas" was a feasible and available alternative method that would significantly reduce his risk of pain. *Id.*, at 42. Mr. Bucklew later clarified that the lethal gas he had in mind was nitrogen, which neither Missouri nor any other State had ever used to carry out an execution.

The district court allowed Mr. Bucklew "extensive discovery" on his new proposal. 883 F. 3d 1087, 1094 (CA8 2018). But even at the close of discovery in 2017, the district court still found the proposal lacking and granted

the State's motion for summary judgment. By this point in the proceedings, Mr. Bucklew's contentions about the pain he might suffer had evolved considerably. He no longer complained about circulation of the drug, the use of dye, or adverse drug interactions. Instead, his main claim now was that he would experience pain during the period after the pentobarbital started to take effect but before it rendered him fully unconscious. According to his expert, Dr. Joel Zivot, while in this semiconscious "twilight stage" Mr. Bucklew would be unable to prevent his tumors from obstructing his breathing, which would make him feel like he was suffocating. Dr. Zivot declined to say how long this twilight stage would last. When pressed, however, he referenced a study on euthanasia in horses. He claimed that the horses in the study had displayed some amount of brain activity, as measured with an electroencephalogram (or EEG), for up to four minutes after they were given a large dose of pentobarbital. Based on Dr. Zivot's testimony, the district court found a triable issue as to whether there was a "substantial risk" that Mr. Bucklew would "experience choking and an inability to breathe for up to four minutes" if he were executed by lethal injection. App. 827. Even so, the court held, Mr. Bucklew's claim failed because he had produced no evidence that his proposed alternative, execution by nitrogen hypoxia, would significantly reduce that risk.

This time, a panel of the Eighth Circuit affirmed. The panel held that Mr. Bucklew had produced no evidence that the risk of pain he alleged "would be substantially reduced by use of nitrogen hypoxia instead of lethal injection as the method of execution." 883 F. 3d, at 1096. Judge Colloton dissented, arguing that the evidence raised a triable issue as to whether nitrogen gas would "render Bucklew insensate more quickly than pentobarbital." *Id.*, at 1099. The full court denied rehearing en banc over a dissent by Judge Kelly, who maintained that, while pris-

oners pursuing facial challenges to a state execution pro-
tocol must plead and prove an alternative method of exe-
cution under *Baze* and *Glossip*, prisoners like Mr. Bucklew
who pursue as-applied challenges should not have to bear
that burden. 885 F. 3d 527, 528 (2018).

On the same day Mr. Bucklew was scheduled to be
executed, this Court granted him a second stay of execu-
tion. 583 U. S. ___ (2018). We then agreed to hear his
case to clarify the legal standards that govern an as-
applied Eighth Amendment challenge to a State's method
of carrying out a death sentence. 584 U. S. ___ (2018).

## II

We begin with Mr. Bucklew's suggestion that the test
for lethal injection protocol challenges announced in *Baze*
and *Glossip* should govern only facial challenges, not as-
applied challenges like his. In evaluating this argument,
we first examine the original and historical understanding
of the Eighth Amendment and our precedent in *Baze* and
*Glossip*. We then address whether, in light of those au-
thorities, it would be appropriate to adopt a different
constitutional test for as-applied claims.

## A

The Constitution allows capital punishment. See *Glos-
sip*, 576 U. S., at ___–___ (slip op., at 2–4); *Baze*, 553 U. S.,
at 47. In fact, death was "the standard penalty for all
serious crimes" at the time of the founding. S. Banner,
The Death Penalty: An American History 23 (2002) (Ban-
ner). Nor did the later addition of the Eighth Amendment
outlaw the practice. On the contrary—the Fifth Amend-
ment, added to the Constitution at the same time as the
Eighth, expressly contemplates that a defendant may be
tried for a "capital" crime and "deprived of life" as a pen-
alty, so long as proper procedures are followed. And the
First Congress, which proposed both Amendments, made a

number of crimes punishable by death. See Act of Apr. 30, 1790, 1 Stat. 112. Of course, that doesn't mean the American people must continue to use the death penalty. The same Constitution that permits States to authorize capital punishment also allows them to outlaw it. But it does mean that the judiciary bears no license to end a debate reserved for the people and their representatives.

While the Eighth Amendment doesn't forbid capital punishment, it does speak to how States may carry out that punishment, prohibiting methods that are "cruel and unusual." What does this term mean? At the time of the framing, English law still formally tolerated certain punishments even though they had largely fallen into disuse— punishments in which "terror, pain, or disgrace [were] superadded" to the penalty of death. 4 W. Blackstone, Commentaries on the Laws of England 370 (1769). These included such "[d]isgusting" practices as dragging the prisoner to the place of execution, disemboweling, quartering, public dissection, and burning alive, all of which Blackstone observed "savor[ed] of torture or cruelty." *Ibid.*

Methods of execution like these readily qualified as "cruel and unusual," as a reader at the time of the Eighth Amendment's adoption would have understood those words. They were undoubtedly "cruel," a term often defined to mean "[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting," 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773), or "[d]isposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness," 1 N. Webster, An American Dictionary of the English Language (1828). And by the time of the founding, these methods had long fallen out of use and so had become "unusual." 4 Blackstone, *supra,* at 370; Banner 76; *Baze*, 553 U. S., at 97 (THOMAS, J., concurring in judgment); see also Stinneford, The Original Meaning of

"Unusual": The Eighth Amendment as a Bar to Cruel Innovation, 102 Nw. U. L. Rev. 1739, 1770–1771, 1814 (2008) (observing that Americans in the late 18th and early 19th centuries described as "unusual" governmental actions that had "fall[en] completely out of usage for a long period of time").

Contemporary evidence confirms that the people who ratified the Eighth Amendment would have understood it in just this way. Patrick Henry, for one, warned that unless the Constitution was amended to prohibit "cruel and unusual punishments," Congress would be free to inflict "tortures" and "barbarous" punishments. 3 Debates on the Federal Constitution 447–448 (J. Elliot 2d ed. 1891). Many early commentators likewise described the Eighth Amendment as ruling out "the use of the rack or the stake, or any of those horrid modes of torture devised by human ingenuity for the gratification of fiendish passion." J. Bayard, A Brief Exposition of the Constitution of the United States 140 (1833); see B. Oliver, The Rights of an American Citizen 186 (1832) (the Eighth Amendment prohibits such "barbarous and cruel punishments" as "[b]reaking on the wheel, flaying alive, rending asunder with horses, . . . maiming, mutilating and scourging to death"). Justice Story even remarked that he thought the prohibition of cruel and unusual punishments likely "unnecessary" because no "free government" would ever authorize "atrocious" methods of execution like these. 3 J. Story, Commentaries on the Constitution of the United States §1896, p. 750 (1833).

Consistent with the Constitution's original understanding, this Court in *Wilkerson* v. *Utah*, 99 U. S. 130 (1879), permitted an execution by firing squad while observing that the Eighth Amendment forbade the gruesome methods of execution described by Blackstone "and all others in the same line of unnecessary cruelty." *Id.*, at 135–136. A few years later, the Court upheld a sentence of death by

electrocution while observing that, though electrocution was a new mode of punishment and therefore perhaps could be considered "unusual," it was not "cruel" in the constitutional sense: "[T]he punishment of death is not cruel, within the meaning of that word as used in the Constitution.  [Cruelty] implies . . . something inhuman and barbarous, something more than the mere extinguishment of life." *In re Kemmler*, 136 U. S. 436, 447 (1890).

It's instructive, too, to contrast the modes of execution the Eighth Amendment was understood to forbid with those it was understood to permit.  At the time of the Amendment's adoption, the predominant method of execution in this country was hanging. *Glossip*, 576 U. S., at ___ (slip op., at 2).  While hanging was considered more humane than some of the punishments of the Old World, it was no guarantee of a quick and painless death.  "Many and perhaps most hangings were evidently painful for the condemned person because they caused death slowly," and "[w]hether a hanging was painless or painful seems to have been largely a matter of chance."  Banner 48, 170.  The force of the drop could break the neck and sever the spinal cord, making death almost instantaneous.  But that was hardly assured given the techniques that prevailed at the time.  More often it seems the prisoner would die from loss of blood flow to the brain, which could produce unconsciousness usually within seconds, or suffocation, which could take several minutes. *Id.*, at 46–47; J. Laurence, The History of Capital Punishment 44–46 (1960); Gardner, Executions and Indignities: An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment, 39 Ohio St. L. J. 96, 120 (1978).  But while hanging could and often did result in significant pain, its use "was virtually never questioned." Banner 170.  Presumably that was because, in contrast to punishments like burning and disemboweling, hanging wasn't "*intended* to be painful"

and the risk of pain involved was considered "unfortunate but inevitable." *Ibid.*; see also *id.*, at 48.

What does all this tell us about how the Eighth Amendment applies to methods of execution? For one thing, it tells us that the Eighth Amendment does not guarantee a prisoner a painless death—something that, of course, isn't guaranteed to many people, including most victims of capital crimes. *Glossip*, 576 U. S., at ___ (slip op., at 4). Instead, what unites the punishments the Eighth Amendment was understood to forbid, and distinguishes them from those it was understood to allow, is that the former were long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) "'superadd[ition]'" of "'terror, pain, or disgrace.'" *Baze*, 553 U. S., at 48; accord, *id.*, at 96 (THOMAS, J., concurring in judgment).

This Court has yet to hold that a State's method of execution qualifies as cruel and unusual, and perhaps understandably so. Far from seeking to superadd terror, pain, or disgrace to their executions, the States have often sought more nearly the opposite, exactly as Justice Story predicted. Through much of the 19th century, States experimented with technological innovations aimed at making hanging less painful. See Banner 170–177. In the 1880s, following the recommendation of a commission tasked with finding "'the most humane and practical method known to modern science of carrying into effect the sentence of death,'" the State of New York replaced hanging with electrocution. *Glossip*, 576 U. S., at ___ (slip op., at 2). Several States followed suit in the "'"belief that electrocution is less painful and more humane than hanging."'" *Ibid.* Other States adopted lethal gas after concluding it was "'the most humane [method of execution] known to modern science.'" *Ibid.* And beginning in the 1970s, the search for less painful modes of execution led many States to switch to lethal injection. *Id.*, at ___ (slip

op., at 3); *Baze*, 553 U. S., at 42, 62; see also Banner 178–181, 196–197, 297. Notably, all of these innovations occurred not through this Court's intervention, but through the initiative of the people and their representatives.

Still, accepting the possibility that a State might try to carry out an execution in an impermissibly cruel and unusual manner, how can a court determine when a State has crossed the line? THE CHIEF JUSTICE's opinion in *Baze*, which a majority of the Court held to be controlling in *Glossip*, supplies critical guidance. It teaches that where (as here) the question in dispute is whether the State's chosen method of execution cruelly superadds pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason. See *Glossip*, 576 U. S., at \_\_\_–\_\_\_ (slip op., at 12–13); *Baze*, 553 U. S., at 52. *Glossip* left no doubt that this standard governs "all Eighth Amendment method-of-execution claims." 576 U. S., at \_\_\_ (slip op., at 1).

In reaching this conclusion, *Baze* and *Glossip* recognized that the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 553 U. S., at 47. To the contrary, the Constitution affords a "measure of deference to a State's choice of execution procedures" and does not authorize courts to serve as "boards of inquiry charged with determining 'best practices' for executions." *Id.*, at 51–52, and nn. 2–3. The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is "substantial when compared to a known and available alternative." *Glossip*, 576 U. S., at \_\_\_ (slip op., at 13); see *Baze*, 553 U. S., at 61. Nor do *Baze* and *Glossip* suggest that traditionally accepted methods of execution—such as hanging, the firing squad, electrocution, and lethal injection—are

necessarily rendered unconstitutional as soon as an arguably more humane method like lethal injection becomes available. There are, the Court recognized, many legitimate reasons why a State might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution. See, *e.g.*, *Glossip*, 576 U. S., at ___–___ (slip op., at 13–14) (a State can't be faulted for failing to use lethal injection drugs that it's unable to procure through good-faith efforts); *Baze*, 553 U. S., at 57 (a State has a legitimate interest in selecting a method it regards as "preserving the dignity of the procedure"); *id.*, at 66 (ALITO, J., concurring) (a State isn't required to modify its protocol in ways that would require the involvement of "persons whose professional ethics rules or traditions impede their participation").

As we've seen, two Members of the Court whose votes were essential to the judgment in *Glossip* argued that establishing cruelty consistent with the Eighth Amendment's original meaning demands slightly more than the majority opinion there (or the *Baze* plurality opinion it followed) suggested. Instead of requiring an inmate to establish that a State has unreasonably refused to alter its method of execution to avoid a risk of unnecessary pain, JUSTICE THOMAS and Justice Scalia contended that an inmate must show that the State *intended* its method to inflict such pain. See *Glossip*, 576 U. S., at ___ (THOMAS, J., concurring) (slip op., at 1); *Baze*, 553 U. S., at 94–107 (THOMAS, J., concurring in judgment). But revisiting that debate isn't necessary here because, as we'll see, the State was entitled to summary judgment in this case even under the more forgiving *Baze-Glossip* test. See Part III, *infra.*

B

Before turning to the application of *Baze* and *Glossip*, however, we must confront Mr. Bucklew's argument that a different standard entirely should govern as-applied chal-

lenges like his. He admits that *Baze* and *Glossip* supply
the controlling test in facial challenges to a State's chosen
method of execution. But he suggests that he should not
have to prove an alternative method of execution in his as-
applied challenge because "certain categories" of punish-
ment are "manifestly cruel . . . without reference to any
alternative methods." Brief for Petitioner 41–42 (internal
quotation marks omitted). He points to "'burning at the
stake, crucifixion, [and] breaking on the wheel'" as exam-
ples of "categorically" cruel methods. *Ibid.* And, he says,
we should use this case to add to the list of "categorically"
cruel methods any method that, as applied to a particular
inmate, will pose a "substantial and particular risk of
grave suffering" due to the inmate's "unique medical
condition." *Id.*, at 44.

The first problem with this argument is that it's fore-
closed by precedent. *Glossip* expressly held that identify-
ing an available alternative is "a requirement of *all* Eighth
Amendment method-of-execution claims" alleging cruel
pain. 576 U. S., at \_\_\_ (slip op., at 1) (emphasis added).
And just as binding as this holding is the reasoning under-
lying it. Distinguishing between constitutionally permis-
sible and impermissible degrees of pain, *Baze* and *Glossip*
explained, is a *necessarily* comparative exercise. To decide
whether the State has cruelly "superadded" pain to the
punishment of death isn't something that can be accom-
plished by examining the State's proposed method in a
vacuum, but only by "compar[ing]" that method with a
viable alternative. *Glossip*, 576 U. S., at \_\_\_ (slip op., at
13); see *Baze*, 553 U. S., at 61. As Mr. Bucklew acknowl-
edges when speaking of facial challenges, this comparison
"provides the needed metric" to measure whether the
State is lawfully carrying out an execution or inflicting
"gratuitous" pain. Brief for Petitioner 42–43. Yet it is
that very comparison and needed metric Mr. Bucklew
would now have us discard. Nor does he offer some per-

suasive reason for overturning our precedent. To the contrary, Mr. Bucklew simply repeats the same argument the principal dissent offered and the Court expressly and thoughtfully rejected in *Glossip*. Just as Mr. Bucklew argues here, the dissent there argued that "certain methods of execution" like "burning at the stake" should be declared "categorically off-limits." And just as Mr. Bucklew submits here, the dissent there argued that any other "intolerably painful" method of execution should be added to this list. 576 U. S., at ___–___ (SOTOMAYOR, J., dissenting) (slip op., at 23–24). Mr. Bucklew's submission, thus, amounts to no more than a headlong attack on precedent.

Mr. Bucklew's argument fails for another independent reason: It is inconsistent with the original and historical understanding of the Eighth Amendment on which *Baze* and *Glossip* rest. As we've seen, when it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment "superadds" pain well beyond what's needed to effectuate a death sentence. And answering that question has always involved a comparison with available alternatives, not some abstract exercise in "categorical" classification. At common law, the ancient and barbaric methods of execution Mr. Bucklew cites were understood to be cruel precisely because—by comparison to other available methods—they went so far beyond what was needed to carry out a death sentence that they could only be explained as reflecting the infliction of pain for pain's sake. Meanwhile, hanging carried with it an acknowledged and substantial risk of pain but was not considered cruel because that risk was thought—by comparison to other known methods—to involve no more pain than was reasonably necessary to impose a lawful death sentence. See *supra*, at 9–12.

What does the principal dissent have to say about all this? It acknowledges that *Glossip*'s comparative re-

quirement helps prevent facial method-of-execution claims from becoming a "backdoor means to abolish" the death penalty. *Post*, at 8 (opinion of BREYER, J.). But, the dissent assures us, there's no reason to worry that as-applied method-of-execution challenges might be used that way. This assurance misses the point. As we've explained, the alternative-method requirement is compelled by our understanding of the Constitution, not by mere policy concerns.

With that, the dissent is left only to rehash the same argument that Mr. Bucklew offers. The dissent insists that some forms of execution are just categorically cruel. *Post*, at 10–11. At first and like others who have made this argument, the dissent offers little more than intuition to support its conclusion. Ultimately, though, even it bows to the necessity of something firmer. If a "comparator is needed" to assess whether an execution is cruel, the dissent tells us, we should compare the pain likely to follow from the use of a lethal injection in this case with the pain-free use of lethal injections in mine-run cases. *Post*, at 10. But that's just another way of saying executions must always be carried out painlessly because they can be carried out painlessly most of the time, a standard the Constitution has never required and this Court has rejected time and time again. *Supra*, at 12. To determine whether the State is cruelly superadding pain, our precedents and history require asking whether the State had some other feasible and readily available method to carry out its lawful sentence that would have significantly reduced a substantial risk of pain.

That Mr. Bucklew and the dissent fail to respect the force of our precedents—or to grapple with the understanding of the Constitution on which our precedents rest—is more than enough reason to reject their view that as-applied and facial challenges should be treated differently. But it turns out their position on this score suffers

from further problems too—problems that neither Mr. Bucklew nor the dissent even attempts to address.

Take this one. A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications. So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding "breadth of the remedy," but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation. *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 331 (2010). Surely it would be strange for the same words of the Constitution to bear entirely different meanings depending only on how broad a remedy the plaintiff chooses to seek. See *Gross* v. *United States*, 771 F. 3d 10, 14–15 (CADC 2014) ("'[T]he substantive rule of law is the same for both [facial and as-applied] challenges'"); *Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*, 462 F. 3d 219, 228 (CA2 2006) (the facial/as-applied distinction affects "*the extent to which* the invalidity of a statute need be demonstrated," not "the *substantive rule of law* to be used"). And surely, too, it must count for something that we have found not a single court decision in over 200 years suggesting that the Eighth Amendment's meaning shifts in this way. To the contrary, our precedent suggests just the opposite. In the related context of an Eighth Amendment challenge to conditions of confinement, we have seen "no basis whatever" for applying a different legal standard to "deprivations inflicted upon all prisoners" and those "inflicted upon particular prisoners." *Wilson* v. *Seiter*, 501 U. S. 294, 299, n. 1 (1991).

Here's yet another problem with Mr. Bucklew's argument: It invites pleading games. The line between facial and as-applied challenges can sometimes prove "amorphous," *Elgin* v. *Department of Treasury*, 567 U. S. 1, 15 (2012), and "not so well defined," *Citizens United*, 558 U. S., at 331. Consider an example. Suppose an inmate

claims that the State's lethal injection protocol violates the Eighth Amendment when used to execute anyone with a very common but not quite universal health condition. Should such a claim be regarded as facial or as-applied? In another context, we sidestepped a debate over how to categorize a comparable claim—one that neither sought "to strike [the challenged law] in all its applications" nor was "limited to plaintiff's particular case"—by concluding that "[t]he label is not what matters." *Doe* v. *Reed*, 561 U. S. 186, 194 (2010). To hold now, for the first time, that choosing a label changes the meaning of the Constitution would only guarantee a good deal of litigation over labels, with lawyers on each side seeking to classify cases to maximize their tactical advantage. Unless increasing the delay and cost involved in carrying out executions is the point of the exercise, it's hard to see the benefit in placing so much weight on what can be an abstruse exercise.

Finally, the burden Mr. Bucklew must shoulder under the *Baze-Glossip* test can be overstated. An inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law. Missouri itself seemed to acknowledge as much at oral argument. Tr. of Oral Arg. 65. So, for example, a prisoner may point to a well-established protocol in another State as a potentially viable option. Of course, in a case like that a court would have to inquire into the possibility that one State possessed a legitimate reason for declining to adopt the protocol of another. See *supra*, at 13–14. And existing state law might be relevant to determining the proper procedural vehicle for the inmate's claim. See *Hill* v. *McDonough*, 547 U. S. 573, 582–583 (2006) (if the relief sought in a 42 U. S. C. §1983 action would "foreclose the State from implementing the [inmate's] sentence under present law," then "recharacterizing a complaint as an action for habeas corpus might be proper"). But the

Eighth Amendment is the supreme law of the land, and the comparative assessment it requires can't be controlled by the State's choice of which methods to authorize in its statutes. In light of this, we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative—assuming, of course, that the inmate is more interested in avoiding unnecessary pain than in delaying his execution.

### III

Having (re)confirmed that anyone bringing a method of execution claim alleging the infliction of unconstitutionally cruel pain must meet the *Baze-Glossip* test, we can now turn to the question whether Mr. Bucklew is able to satisfy that test. Has he identified a feasible and readily implemented alternative method of execution the State refused to adopt without a legitimate reason, even though it would significantly reduce a substantial risk of severe pain? Because the case comes to us after the entry of summary judgment, this appeal turns on whether Mr. Bucklew has shown a genuine issue of material fact warranting a trial.

### A

We begin with the question of a proposed alternative method. Through much of this case and despite many opportunities, Mr. Bucklew refused to identify *any* alternative method of execution, choosing instead to stand on his argument that *Baze* and *Glossip*'s legal standard doesn't govern as-applied challenges like his (even after the Eighth Circuit rejected that argument). Only when the district court warned that his continued refusal to abide this Court's precedents would result in immediate dismissal did Mr. Bucklew finally point to nitrogen hypoxia. The district court then afforded Mr. Bucklew "extensive discovery" to explore the viability of that alternative.

883 F. 3d, at 1094. But even after all that, we conclude Mr. Bucklew has failed for two independent reasons to present a triable question on the viability of nitrogen hypoxia as an alternative to the State's lethal injection protocol.

*First*, an inmate must show that his proposed alternative method is not just theoretically "'feasible'" but also "'readily implemented.'" *Glossip*, 576 U. S., at \_\_\_–\_\_\_ (slip op., at 12–13). This means the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out "relatively easily and reasonably quickly." *McGehee* v. *Hutchinson*, 854 F. 3d 488, 493 (CA8 2017); *Arthur* v. *Commissioner, Ala. Dept. of Corrections*, 840 F. 3d 1268, 1300 (CA11 2016). Mr. Bucklew's barebones proposal falls well short of that standard. He has presented no evidence on essential questions like how nitrogen gas should be administered (using a gas chamber, a tent, a hood, a mask, or some other delivery device); in what concentration (pure nitrogen or some mixture of gases); how quickly and for how long it should be introduced; or how the State might ensure the safety of the execution team, including protecting them against the risk of gas leaks. Instead of presenting the State with a readily implemented alternative method, Mr. Bucklew (and the principal dissent) point to reports from correctional authorities in other States indicating that additional study is needed to develop a protocol for execution by nitrogen hypoxia. See App. 697 (Oklahoma grand jury report recommending that the State "retain experts" and conduct "further research" to "determine how to carry out the sentence of death by this method"); *id.*, at 736 (report of Louisiana Dept. of Public Safety & Corrections stating that "[r]esearch . . . is ongoing" to develop a nitrogen hypoxia protocol). That is a proposal for more research, not the readily implemented alternative that *Baze* and *Glossip* require.

*Second*, and relatedly, the State had a "legitimate" reason for declining to switch from its current method of execution as a matter of law. *Baze*, 553 U. S., at 52. Rather than point to a proven alternative method, Mr. Bucklew sought the adoption of an entirely new method— one that had "never been used to carry out an execution" and had "no track record of successful use." *McGehee*, 854 F. 3d, at 493. But choosing not to be the first to experiment with a new method of execution is a legitimate reason to reject it. In *Baze* we observed that "no other State ha[d] adopted" the one-drug protocol the inmates sought and they had "proffered no study showing" their one-drug protocol would be as effective and humane as the State's existing three-drug protocol. 553 U. S., at 57. Under those circumstances, we held as a matter of law that Kentucky's refusal to adopt the inmates' proffered protocol could not "constitute a violation of the Eighth Amendment." *Ibid.* The Eighth Amendment prohibits States from dredging up archaic cruel punishments or perhaps inventing new ones, but it does not compel a State to adopt "untried and untested" (and thus unusual in the constitutional sense) methods of execution. *Id.*, at 41.[1]

—————

[1] While this case has been pending, a few States have authorized nitrogen hypoxia as a method of execution. See 2018 Ala. Acts no. 2018–353 (allowing condemned inmates to elect execution by nitrogen hypoxia); 2017 Miss. Laws ch. 406, p. 905 (authorizing execution by nitrogen hypoxia only if lethal injection is held unconstitutional or is otherwise unavailable); 2015 Okla. Sess. Laws ch. 75, p. 244 (same). In March 2018, officials in Oklahoma announced that, due to the unavailability of lethal injection drugs, the State would use nitrogen gas for its executions going forward. See Williams, Oklahoma Proposes To Use Nitrogen Gas for Executions by Asphyxiation, N. Y. Times, Mar. 15, 2018, p. A22. But Oklahoma has so far been unable to find a manufacturer willing to sell it a gas delivery device for use in executions. See Clay, State Not Ready for Executions, The Oklahoman, Jan. 27, 2019, p. A1. To date, no one in this case has pointed us to an execution in this country using nitrogen gas.

## B

Even if a prisoner can carry his burden of showing a readily available alternative, he must still show that it would significantly reduce a substantial risk of severe pain. *Glossip*, 576 U. S., at \_\_\_ (slip op., at 13); *Baze*, 553 U. S., at 52. A minor reduction in risk is insufficient; the difference must be clear and considerable. Over the course of this litigation, Mr. Bucklew's explanation why nitrogen hypoxia meets this standard has evolved significantly. But neither of the two theories he has advanced in this Court turns out to be supported by record evidence.

*First*, Mr. Bucklew points to several risks that he alleges could result from use of the State's lethal injection protocol that would not be present if the State used nitrogen gas. For example, he says the execution team might try to insert an IV into one of his peripheral veins, which could cause the vein to rupture; or the team might instead use an allegedly painful "cut-down" procedure to access his femoral vein. He also says that he might be forced to lie flat on his back during the execution, which could impair his breathing even before the pentobarbital is administered. And he says the stress from all this could cause his tumors to bleed, further impairing his breathing. These risks, we may assume, would not exist if Mr. Bucklew were executed by his preferred method of nitrogen hypoxia.

The problem with all of these contentions is that they rest on speculation unsupported, if not affirmatively contradicted, by the evidence in this case. Nor does the principal dissent contend otherwise. So, for example, uncontroverted record evidence indicates that the execution team will have discretion to adjust the gurney to whatever position is in Mr. Bucklew's best medical interests. 883 F. 3d, at 1092, n. 3; App. 531. Moreover, the State agreed in the district court that it would not try to place an IV in Mr. Bucklew's compromised peripheral veins. *Id.*, at 820; see Brief for Appellant in No. 17–3052 (CA8), p. 7. And,

assuming without granting that using a cut-down would raise issues under the Eighth Amendment—but see *Nooner* v. *Norris*, 594 F. 3d 592, 604 (CA8 2010) (holding otherwise)—the State's expert, Dr. Michael Antognini, testified without contradiction that it should be possible to place an IV in Mr. Bucklew's femoral vein without using a cut-down procedure, App. 350. Mr. Bucklew responds by pointing to the warden's testimony that he once saw medical staff perform a cut-down as part of an execution; but there's no evidence that what the warden saw was an attempt to access a femoral vein, as opposed to some other vein.

Moreover, to the extent the record is unclear on any of these issues, Mr. Bucklew had ample opportunity to conduct discovery and develop a factual record concerning exactly what procedures the State planned to use. He failed to do so—presumably because the thrust of his constitutional claim was that *any* attempt to execute him via lethal injection would be unconstitutional, regardless of the specific procedures the State might use. As the court of appeals explained: "Having taken the position that *any* lethal injection procedure would violate the Eighth Amendment," Mr. Bucklew "made no effort to determine what changes, if any, the [State] would make in applying its lethal injection protocol" to him, and he "never urged the district court to establish a suitable fact-finding procedure . . . to define the as-applied lethal injection protocol [the State] intends to use." 883 F. 3d, at 1095–1096.[2]

––––––––––

[2] While the district court allowed discovery on many other matters, Mr. Bucklew protests that it did not permit him to learn the identities of the lethal injection execution team members, to depose them, or to inquire into their qualifications, training, and experience. Like the Eighth Circuit, we see no abuse of discretion in the district court's discovery rulings. As the district court explained, Mr. Bucklew argues that there is no way he may be constitutionally executed by lethal

*Second*, Mr. Bucklew contends that the lethal injection itself will expose him to a substantial risk of severe pain that could be eliminated by adopting his preferred method. He claims that once the sedative pentobarbital is injected he will "lose the ability to manage" the tumors in his airway and, as a result, will experience a "sense of suffocation" for some period of time before the State's sedative renders him fully unconscious. Brief for Petitioner 12–13. "It is during this in-between twilight stage," according to his expert, Dr. Zivot, "that Mr. Bucklew is likely to experience prolonged feelings of suffocation and excruciating pain." App. 234. Mr. Bucklew admits that similar feelings of suffocation could occur with nitrogen, the only difference being the potential duration of the so-called "twilight stage." He contends that with nitrogen the stage would last at most 20 to 30 seconds, while with pentobarbital it could last up to several minutes.

But here again the record contains insufficient evidence to permit Mr. Bucklew to avoid summary judgment. For starters, in the courts below Mr. Bucklew maintained he would have trouble managing his airway only if he were forced to lie supine, which (as we've explained) the evidence shows he won't be. (The dissenters don't address this point.) But even indulging his new claim that he will have this difficulty regardless of position, he still has failed to present colorable evidence that nitrogen would significantly reduce his risk of pain. We can assume for argument's sake that Mr. Bucklew is correct that with nitrogen the twilight stage would last 20 to 30 seconds. The critical question, then, is how long that period might last with pentobarbital. The State's expert, Dr. Antognini, testified that pentobarbital, too, would render Mr. Buck-

––––––––––

injection, even with modifications to the State's lethal injection protocol. And in a case like that, discovery into such granular matters as who administers the protocol simply is not relevant.

lew fully unconscious and incapable of experiencing pain within 20 to 30 seconds. *Id.*, at 299–301, 432–433. Dr. Zivot disagreed; but when he was asked how long he thought the twilight stage would last with pentobarbital, his testimony was evasive. Eventually, he said his "number would be longer than" 20 to 30 seconds, but he declined to say how much longer. *Id.*, at 195. Instead, he referenced a 2015 study on euthanasia in horses. He said the study found that when horses were given a large dose of pentobarbital (along with other drugs), they exhibited "isoelectric EEG"—a complete absence of detectable brain activity—after 52 to 240 seconds. *Id.*, at 194–196. The district court assumed Dr. Zivot meant that "pain might be felt until measurable brain activity ceases" and that, extrapolating from the horse study, it might take up to four minutes for pentobarbital to "induc[e] a state in which [Mr. Bucklew] could no longer sense that he is choking or unable to breathe." The district court acknowledged, however, that this might be "a generous interpretation of Dr. Zivot's testimony." *Id.*, at 822, and n. 5.

In fact, there's nothing in the record to suggest that Mr. Bucklew will be capable of experiencing pain for significantly more than 20 to 30 seconds after being injected with pentobarbital. For one thing, Mr. Bucklew's lawyer now admits that Dr. Zivot "crossed up the numbers" from the horse study. Tr. of Oral Arg. 7–8, 11–12. The study actually reported that the horses displayed isoelectric EEG between 2 and 52 seconds after infusion of pentobarbital was completed, with an average time of less than 24 seconds. App. 267. So if anything, the horse study appears to bolster Dr. Antognini's time estimate. For another thing, everyone now also seems to acknowledge that isoelectric EEG is the wrong measure. Dr. Zivot never claimed the horses were capable of experiencing pain until they reached isoelectric EEG. And Mr. Bucklew's lawyer now concedes that doctors perform major surgery on hu-

man patients with measurable EEG readings, which strongly suggests that Mr. Bucklew will be insensible to pain *before* reaching isoelectric EEG. Tr. of Oral Arg. 9. Finally, the record evidence even allows the possibility that nitrogen could *increase* the risk of pain. Because Dr. Zivot declined to testify about the likely effects of nitrogen gas, Mr. Bucklew must rely on Dr. Antognini's testimony. And while Dr. Antognini did say he thought nitrogen's "onset of action" could be "relatively fast," App. 458, he added that the effects of nitrogen could vary depending on exactly how it would be administered—information Mr. Bucklew hadn't provided. Indeed, he stated that "depending on . . . how it's used, you might get more suffering from nitrogen gas than you would have" from the State's current protocol. *Id.*, at 460–461.

Of course, the principal dissent maintains that Dr. Zivot's testimony supports an inference that pentobarbital might cause Mr. Bucklew to suffer for a prolonged period. But its argument rests on a number of mistakes about the record. For example, the dissent points to Dr. Zivot's remark that, with pentobarbital, "'the period of time between receiving the injection and death could range over a few minutes to many minutes.'" *Post*, at 4, 6 (quoting App. 222). From this, the dissent concludes that Mr. Bucklew may suffer for "up to several minutes." *Post*, at 1, 6, 9. But everyone agrees that the relevant question isn't how long it will take for Mr. Bucklew to die, but how long he will be capable of feeling pain. Seeking to address the problem, the dissent next points to *another* part of Dr. Zivot's testimony and says it means Mr. Bucklew could experience pain during the entire time between injection and death. *Post*, at 6, 13 (quoting App. 222). But the dissent clips the relevant quotation. As the full quotation makes clear, Dr. Zivot claimed that Mr. Bucklew might be unable to "maintain the integrity of his airway" until he died—but he carefully avoided claiming that Mr. Bucklew

would be capable of feeling pain until he died.[3]  To avoid
*this* problem, the dissent quotes Dr. Zivot's assertions that
pentobarbital might not produce "'rapid unconsciousness'"
and that Mr. Bucklew's suffering with pentobarbital could
be "'prolonged.'"  *Post*, at 4–6, 13 (quoting App. 233–234).
But Dr. Zivot's statements here, too, fail to specify how
long Mr. Bucklew is likely to be able to feel pain.  The
hard fact is that, when Dr. Zivot was *finally* compelled to
offer a view on this question, his only response was to
refer to the horse study.  *Id.*, at 195–196.  The dissent's
effort to suggest that Dr. Zivot "did not rely exclusively or
even heavily on that study," *post*, at 7, is belied by (among
other things) Mr. Bucklew's own brief in this Court, which
asserted that the twilight stage during which he might
feel pain could last "between 52 and 240 seconds," based
entirely on a citation of Dr. Zivot's incorrect testimony
about the horse study.  Brief for Petitioner 13.

In sum, even if execution by nitrogen hypoxia were a
feasible and readily implemented alternative to the State's
chosen method, Mr. Bucklew has still failed to present any
evidence suggesting that it would significantly reduce his
risk of pain.  For that reason as well, the State was enti-
tled to summary judgment on Mr. Bucklew's Eighth
Amendment claim.[4]

––––––––––

[3] Here's the full quotation, with the portion quoted by the dissent
underlined:

"As a result of his inability to maintain the integrity of his airway
for the period of time beginning with the injection of the Pento-
barbital solution and ending with Mr. Bucklew's death several
minutes to as long as many minutes later, Mr. Bucklew would be
highly likely to experience feelings of 'air hunger' and the excruci-
ating pain of prolonged suffocation resulting from the complete
obstruction of his airway by the large vascular tumor."  App. 222.

[4] The State contends that Mr. Bucklew's claim should fail for yet an-
other reason: because, in the State's view, the evidence does not show
that he is very likely to suffer "'*severe* pain'" cognizable under the

## IV

"Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill*, 547 U. S., at 584. Those interests have been frustrated in this case. Mr. Bucklew committed his crimes more than two decades ago. He exhausted his appeal and separate state and federal habeas challenges more than a decade ago. Yet since then he has managed to secure delay through lawsuit after lawsuit. He filed his current challenge just days before his scheduled execution. That suit has now carried on for five years and yielded two appeals to the Eighth Circuit, two 11th-hour stays of execution, and plenary consideration in this Court. And despite all this, his suit in the end amounts to little more than an attack on settled precedent, lacking enough evidence even to survive summary judgment—and on not just one but many essential legal elements set forth in our case law and required by the Constitution's original meaning.

The people of Missouri, the surviving victims of Mr. Bucklew's crimes, and others like them deserve better. Even the principal dissent acknowledges that "the long delays that now typically occur between the time an offender is sentenced to death and his execution" are "excessive." *Post*, at 16. The answer is not, as the dissent incongruously suggests, to reward those who interpose delay with a decree ending capital punishment by judicial fiat. *Post*, at 18. Under our Constitution, the question of capital punishment belongs to the people and their representatives, not the courts, to resolve. The proper role of courts is to ensure that method-of-execution challenges to law-

—————

Eighth Amendment. *Glossip* v. *Gross*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 13) (quoting *Baze* v. *Rees*, 553 U. S. 35, 52 (2008); emphasis added). We have no need, however, to address that argument because (as explained above) Mr. Bucklew fails even to show that a feasible and readily available alternative could significantly reduce the pain he alleges.

fully issued sentences are resolved fairly and expeditiously. Courts should police carefully against attempts to use such challenges as tools to interpose unjustified delay. Last-minute stays should be the extreme exception, not the norm, and "the last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay." *Hill*, 547 U. S., at 584 (internal quotation marks omitted). So, for example, we have vacated a stay entered by a lower court as an abuse of discretion where the inmate waited to bring an available claim until just 10 days before his scheduled execution for a murder he had committed 24 years earlier. See *Dunn* v. *Ray*, 586 U. S. ___ (2019).[5] If litigation is allowed to proceed, federal courts "can and should" protect settled state judgments from "undue interference" by invoking their "equitable powers" to dismiss or curtail suits that are pursued in a "dilatory"

——————

[5] Seeking to relitigate *Dunn* v. *Ray*, the principal dissent asserts that that case involved no undue delay because the inmate "brought his claim only five days after he was notified" that the State would not allow his spiritual adviser to be present with him in the execution chamber itself, although it *would* allow the adviser to be present on the other side of a glass partition. *Post*, at 17. But a state statute listed "[t]he spiritual adviser of the condemned" as one of numerous individuals who would be allowed to "be present at an execution," many of whom—such as "newspaper reporters," "relatives or friends of the condemned person," and "the victim's immediate family members"—obviously would not be allowed into the chamber itself. Ala. Code §15–18–83 (2018). The inmate thus had long been on notice that there was a question whether his adviser would be allowed into the chamber or required to remain on the other side of the glass. Yet although he had been on death row since 1999, and the State had set a date for his execution on November 6, 2018, he waited until January 23, 2019—just 15 days before the execution—to ask for clarification. He then brought a claim 10 days before the execution and sought an indefinite stay. This delay implicated the "strong equitable presumption" that no stay should be granted "where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006).

fashion or based on "speculative" theories. *Id.*, at 584–585.

*

The judgment of the court of appeals is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–8151

_____

## RUSSELL BUCKLEW, PETITIONER *v.* ANNE L. PRECYTHE, DIRECTOR, MISSOURI DEPARTMENT OF CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[April 1, 2019]

JUSTICE THOMAS, concurring.

I adhere to my view that "a method of execution violates the Eighth Amendment only if it is deliberately designed to inflict pain." *Baze* v. *Rees*, 553 U. S. 35, 94 (2008) (opinion concurring in judgment); *ante*, at 14. Because there is no evidence that Missouri designed its protocol to inflict pain on anyone, let alone Russell Bucklew, I would end the inquiry there. Nonetheless, I join the Court's opinion in full because it correctly explains why Bucklew's claim fails even under the Court's precedents.

I write separately to explain why JUSTICE BREYER's dissenting opinion does not cast doubt on this standard. *Post*, at 15–16. As I explained in *Baze*, "the evil the Eighth Amendment targets is intentional infliction of gratuitous pain." 553 U. S., at 102 (opinion concurring in judgment). The historical evidence shows that the Framers sought to disable Congress from imposing various kinds of torturous punishments, such as "'gibbeting,'" "burning at the stake," and "'embowelling alive, beheading, and quartering.'" *Id.*, at 95–98 (quoting 4 W. Blackstone, Commentaries *376 (Blackstone), and S. Banner, The Death Penalty: An American History 71–72 (2002)). In England, these aggravated forms of capital punishment were "'superadded'" to increase terror and disgrace for

"'very atrocious crimes,'" such as treason and murder.
See *Baze*, *supra*, at 96–97 (quoting 4 Blackstone *376).
The founding generation ratified the Eighth Amendment
to reject that practice, contemplating that capital punish-
ment would continue, but without those punishments
deliberately designed to superadd pain. See *Baze*, 553
U. S., at 97–98. Under this view, the constitutionality of a
particular execution thus turns on whether the Govern-
ment "deliberately designed" the method of execution "to
inflict pain," *id.,* at 94, without regard to the subjective
intent of the executioner.

Contrary to JUSTICE BREYER's suggestion, my view does
not render the Eighth Amendment "a static prohibition"
proscribing only "the same things that it proscribed in the
18th century." *Post,* at 15–16. A method of execution not
specifically contemplated at the founding could today be
imposed to "superad[d]" "terror, pain, or disgrace." 4
Blackstone *376. Thankfully—and consistent with Justice
Story's view that the Eighth Amendment is "wholly un-
necessary in a free government," 3 J. Story, Commentaries
on the Constitution of the United States 750 (1833)—
States do not attempt to devise such diabolical punish-
ments. *E.g.*, *Baze*, *supra*, at 107 ("Kentucky adopted its
lethal injection protocol in an effort to make capital pun-
ishment more humane"). It is therefore unsurprising that,
despite JUSTICE BREYER's qualms about the death pen-
alty, *e.g.*, *post*, at 18, this Court has never held a method of
execution unconstitutional. Because the Court correctly
declines to do so again today, I join in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–8151

_____

## RUSSELL BUCKLEW, PETITIONER *v.* ANNE L. PRECYTHE, DIRECTOR, MISSOURI DEPARTMENT OF CORRECTIONS, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 1, 2019]

JUSTICE KAVANAUGH, concurring.

When an inmate raises an *as-applied* constitutional challenge to a particular method of execution—that is, a challenge to a method of execution that is constitutional in general but that the inmate says is very likely to cause him severe pain—one question is whether the inmate must identify an available alternative method of execution that would significantly reduce the risk of severe pain. Applying our recent decisions in *Glossip* v. *Gross*, 576 U. S. \_\_\_ (2015), and *Baze* v. *Rees*, 553 U. S. 35 (2008) (plurality opinion), the Court's answer to that question is yes. Under those precedents, I agree with the Court's holding and join the Court's opinion.

I write to underscore the Court's additional holding that the alternative method of execution need not be authorized under current state law—a legal issue that had been uncertain before today's decision. See *Arthur* v. *Dunn*, 580 U. S. \_\_\_, \_\_\_–\_\_\_ (2017) (slip op., at 9–11) (SOTOMAYOR, J., dissenting from denial of certiorari). Importantly, all nine Justices today agree on that point. *Ante*, at 19; *post*, at 14 (BREYER, J., dissenting).

As the Court notes, it follows from that additional holding that the burden of the alternative-method requirement "can be overstated." *Ante*, at 19. Indeed, the Court

states: "[W]e see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." *Ante*, at 20.

In other words, an inmate who contends that a particular method of execution is very likely to cause him severe pain should ordinarily be able to plead some alternative method of execution that would significantly reduce the risk of severe pain. At oral argument in this Court, the State suggested that the firing squad would be such an available alternative, if adequately pleaded. Tr. of Oral Arg. 63–64 ("He can plead firing squad. . . . Of course, if he had . . . pleaded firing squad, it's possible that Missouri could have executed him by firing squad"). JUSTICE SOTOMAYOR has likewise explained that the firing squad is an alternative method of execution that generally causes an immediate and certain death, with close to zero risk of a botched execution. See *Arthur*, 580 U. S., at ___–___ (slip op., at 17–18). I do not here prejudge the question whether the firing squad, or any other alternative method of execution, would be a feasible and readily implemented alternative for every State. See *McGehee* v. *Hutchinson*, 854 F. 3d 488, 493–494 (CA8 2017). Rather, I simply emphasize the Court's statement that "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." *Ante*, at 20.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–8151

_____

## RUSSELL BUCKLEW, PETITIONER *v.* ANNE L. PRECYTHE, DIRECTOR, MISSOURI DEPARTMENT OF CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 1, 2019]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join as to all but Part III, dissenting.

The Court's decision in this case raises three questions. The first is primarily a factual question, namely, whether Bucklew has established genuine issues of material fact concerning whether executing him by lethal injection would cause him excessive suffering. The second is primarily a legal question, namely, whether a prisoner like Bucklew with a rare medical condition must identify an alternative method by which the State may execute him. And the third is a more general question, namely, how to minimize delays in executing offenders who have been condemned to death.

I disagree with the majority's answers to all three questions. Bucklew cites evidence that executing him by lethal injection will cause the tumors that grow in his throat to rupture during his execution, causing him to sputter, choke, and suffocate on his own blood for up to several minutes before he dies. That evidence establishes at this stage of the proceedings that executing Bucklew by lethal injection risks subjecting him to constitutionally impermissible suffering. The majority holds that the State may execute him anyway. In my view, that holding violates

the clear command of the Eighth Amendment.

## I

I begin with a factual question: whether Bucklew has established that, because of his rare medical condition, the State's current method of execution risks subjecting him to excessive suffering. See *Glossip* v. *Gross*, 576 U. S. ___, ___ (2015) (slip op., at 13) (requiring "a demonstrated risk of severe pain"); see also *Baze* v. *Rees*, 553 U. S. 35, 50 (2008) (plurality opinion) (requiring "a substantial risk of serious harm" (internal quotation marks omitted)).

There is no dispute as to the applicable summary judgment standard. Because the State moved for summary judgment, it can prevail if, but only if, it "shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. Proc. 56(a); see also *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 248 (1986). On review, we examine the record as a whole, which includes "depositions, documents, [and] affidavits or declarations." Rule 56(c). And we must construe the evidence in the light most favorable to Bucklew and draw every justifiable inference in his favor. See *Tolan* v. *Cotton*, 572 U. S. 650, 651 (2014) (*per curiam*).

## A

Bucklew has easily established a genuine issue of material fact regarding whether an execution by lethal injection would subject him to impermissible suffering.

The record indicates that Bucklew suffers from a congenital condition known as cavernous hemangioma that causes tumors filled with blood vessels to grow throughout his body, including in his head, face, neck, and oral cavity. The condition is rare. One study estimates that hemangiomas in the oral cavity occur in less than one percent of the population, and that hemangiomas like Bucklew's have been identified in five cases. See Wang, Chen, Mojica, & Chen, Cavernous Hemangioma of the Uvula, 8 N.

Am. J. Med. & Sci. 56, 56–59 (2015).

Tumors grow out of Bucklew's lip and over his mouth, as well as on his hard and soft palates. One tumor also grows directly on Bucklew's uvula, which has become "grossly enlarged" as a result. App. 225. (The uvula is the "pendent fleshy lobe" that hangs from the back of the throat. Merriam-Webster's Collegiate Dictionary 1379 (11th ed. 2003).) Bucklew's tumors obstruct his airway and make it difficult for him to breathe. His difficulty breathing is chronic, but is particularly acute when he lies flat and gravity pulls his engorged uvula into his airway. He often has to adjust the positioning of his head to prevent his uvula from obstructing his breathing. He sleeps at a 45-degree angle to facilitate breathing, and he often wakes up in the middle of the night gasping for air.

Due to the sensitivity of his tumors, even minimal contact may cause them to hemorrhage. He has described past hemorrhages as "'squirting'" or "leaking" blood, and he states that the first thing he does each morning is to wipe the blood off his face that leaked from his nose and mouth as he slept. Bucklew's condition is progressive and, due to the risk of significant blood loss caused by the sensitivity of his tumors, cannot be treated by surgery.

Bucklew maintains that, as a result of this medical condition, executing him by lethal injection would prove excruciatingly painful. In support of this claim, Bucklew submitted sworn declarations and deposition testimony from an expert witness, Dr. Joel Zivot, an anesthesiologist. Dr. Zivot provided extensive testimony regarding the pain that Bucklew would likely endure in an execution by lethal injection:

- Dr. Zivot testified that in light of "the degree to which Mr. Bucklew's airway is compromised by the hemangiomas" and "the particular psychological and physical effects of lethal injection, it is highly likely that Mr.

Bucklew would be unable to maintain the integrity of his airway during the time after receiving the lethal injection and before death." App. 221.

- Dr. Zivot explained that, as a result of "the highly friable and fragile state of the tissue of Mr. Bucklew's mouth and airway," Bucklew "will likely experience hemorrhaging and/or the possible rupture of the tumor" on his uvula during his execution. *Id.*, at 222.

- Dr. Zivot added that the "hemorrhaging will further impede Mr. Bucklew's airway by filling his mouth and airway with blood, causing him to choke and cough on his own blood." *Ibid.*

- Dr. Zivot concluded that "it is highly likely that Mr. Bucklew, given his specific congenital medical condition, cannot undergo lethal injection without experiencing the excruciating pain and suffering" of "suffocation, convulsions, and visible hemorrhaging." *Id.*, at 223.

Dr. Zivot also testified about the duration of pain to which an execution by lethal injection would subject Bucklew, describing it as "prolonged." *Id.*, at 234.

- Dr. Zivot stated that the effects of a pentobarbital injection "are highly unlikely to be instantaneous and the period of time between receiving the injection and death could range *over a few minutes to many minutes*." *Id.*, at 222 (emphasis added).

- Dr. Zivot "strongly disagree[d] with [the State's expert's] repeated claim that the pentobarbital injection would result in 'rapid unconsciousness.' " *Id.*, at 233.

- Dr. Zivot explained that Bucklew "would likely experience unconsciousness that sets in progressively as the chemical circulates through his system" and that it was during this period that Bucklew was "likely to experience prolonged feelings of suffocation and excruciating pain." *Id.*, at 233–234.

The State asked the District Court to grant summary judgment in its favor on the theory that Bucklew failed to identify a genuine factual issue regarding whether an execution by lethal injection would be impermissibly painful. The District Court refused. The court believed that Bucklew had adequately shown that for up to several minutes he "could be aware that he is choking or unable to breathe but be unable to 'adjust' his breathing to remedy the situation." *Id.*, at 827. Recognizing that the State's evidence suggested that Bucklew would experience this choking sensation for a shorter period, the District Court concluded that the dispute between the experts was "a factual dispute that the Court cannot resolve on summary judgment, and would have to be resolved at trial." *Ibid.*

The District Court was right. The evidence, taken in the light most favorable to Bucklew, creates a genuine factual issue as to whether Missouri's lethal injection protocol would subject him to several minutes of "severe pain and suffering," *Glossip*, 576 U. S., at \_\_\_ (slip op., at 13), during which he would choke and suffocate on his own blood. In my view, executing Bucklew by forcing him to choke on his grossly enlarged uvula and suffocate on his blood would exceed "the limits of civilized standards." *Kennedy* v. *Louisiana*, 554 U. S. 407, 435 (2008) (internal quotation marks omitted); see also *Trop* v. *Dulles*, 356 U. S. 86, 100–101 (1958) (plurality opinion). The experts dispute whether Bucklew's execution will prove as unusually painful as he claims, but resolution of that dispute is a matter for trial.

### B

The majority, while characterizing the matter as "critical," says that there is "nothing in the record to suggest that Mr. Bucklew will be capable of experiencing pain for significantly more than 20 to 30 seconds after being injected with pentobarbital." *Ante*, at 26. But what about Dr. Zivot's testimony that the time between injection and death "could range over a few minutes to many minutes"? App. 222. What about Dr. Zivot's characterization of the pain involved as "prolonged"? *Id.*, at 234. What about Dr. Zivot's "stron[g] disagree[ment] with [the State's expert's] repeated claim that the pentobarbital injection would result in 'rapid unconsciousness'"? *Id.*, at 233.

The majority construes Dr. Zivot's testimony to show only that Bucklew might remain alive for several minutes after the injection, not that he will be capable of feeling pain for several minutes after the injection. *Ante*, at 27. But immediately following his prediction that the time between injection and death could range up to many minutes, Dr. Zivot stated that "beginning with the injection of the Pentobarbital solution and ending with Mr. Bucklew's death *several minutes to as long as many minutes* later, Mr. Bucklew would be highly likely to experience feelings of 'air hunger' *and the excruciating pain of prolonged suffocation.*" App. 222 (emphasis added). Dr. Zivot thus testified both that lethal injection would take up to several minutes to kill Bucklew and that Bucklew would experience excruciating pain during this period. And it is not the case, as the majority believes, that Dr. Zivot "carefully avoided claiming that Mr. Bucklew would be capable of feeling pain until he died," *ante*, at 28, particularly given that the record must be construed in the light most favorable to Bucklew.

The majority also justifies its refusal to credit Dr. Zivot's testimony on the ground that Dr. Zivot gave a response during his deposition suggesting that he misinterpreted a

study of euthanasia in horses. *Ante*, at 26–27. Bucklew's expert, however, did not rely exclusively or even heavily upon that study; he mentioned it only in response to a question posed in his deposition. To the contrary, Dr. Zivot explained that his testimony regarding the pain to which Bucklew would be subjected was "supported both by [his] own professional knowledge of how chemicals of this type are likely to exert their effects in the body as well as by the terms of Missouri's Execution Procedure." App. 222.

Whether any mistake about the importance of a single study makes all the difference to Bucklew's case is a matter not for this Court to decide at summary judgment, but for the factfinder to resolve at trial. As Judge Colloton pointed out in dissent below, attacks on the "reliability and credibility of Dr. Zivot's opinion," including "his possible misreading of the horse study on which he partially relied," give rise to factual disputes. See 883 F. 3d 1087, 1099 (CA8 2018). Judge Colloton therefore concluded that "[t]he district court did not err in concluding that it could not resolve the dispute between the experts on summary judgment." *Ibid.* I agree.

## II

This case next presents a legal question. The Court in *Glossip* held in the context of a facial challenge to a State's execution protocol that the plaintiffs were required not only to establish that the execution method gave rise to a "demonstrated risk of severe pain," but also to identify a "known and available" alternative method. 576 U. S., at \_\_\_ (slip op., at 13). The Court added that the alternative must be "feasible, readily implemented, and in fact significantly reduc[e] a substantial risk of severe pain." *Id.,* at \_\_\_–\_\_\_ (slip op., at 12–13) (internal quotation marks omitted).

I joined the dissent in *Glossip,* but for present purposes

I accept the *Glossip* majority opinion as governing.  I nonetheless do not believe its "alternative method" requirement applies in this case.  We "often read general language in judicial opinion[s] as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Illinois* v. *Lidster*, 540 U. S.  419, 424 (2004).  And while I acknowledge that the Court in *Glossip* spoke in unqualified terms, the circumstances in *Glossip* were indeed "different" in relevant respects from the circumstances presented here.

A

The plaintiffs in *Glossip* undertook an across-the-board attack against the use of a particular execution method, which they maintained violated the Eighth Amendment categorically.  In this case, by contrast, Bucklew does not attack Missouri's lethal injection protocol categorically, or even in respect to any execution other than his own. Instead, he maintains that he is special; that he suffers from a nearly unique illness; and that, by virtue of that illness, Missouri's execution method will be excruciatingly painful for him even though it would not affect others in the same way.  These differences make a difference.

*First*, these differences show that the reasons that underlie *Glossip*'s "alternative method" requirement do not apply here.

The *Glossip* Court stressed the importance of preventing method-of-execution challenges from becoming a backdoor means to abolish capital punishment in general.  The Court wrote that "because it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out." *Glossip*, 576 U. S., at ___ (slip op., at 4) (alterations omitted). The Court added that "we have time and again reaffirmed that capital punishment is not *per se* unconstitutional."

*Id.*, at \_\_\_ (slip op., at 16). And the Court feared that allowing prisoners to invalidate a State's method of execution without identifying an alternative would "effectively overrule these decisions." *Ibid.* But there is no such risk here. Holding Missouri's lethal injection protocol unconstitutional as applied to Bucklew—who has a condition that has been identified in only five people, see *supra,* at 2–3—would not risk invalidating the death penalty in Missouri. And, because the State would remain free to execute prisoners by other permissible means, declining to extend *Glossip*'s "alternative method" requirement in this context would be unlikely to exempt Bucklew or any other prisoner from the death penalty. Even in the unlikely event that the State could not identify a permissible alternative in a particular case, it would be perverse to treat that as a reason to execute a prisoner by the method he has shown to involve excessive suffering.

The *Glossip* Court, in adopting the "alternative method" requirement, relied on THE CHIEF JUSTICE's plurality opinion in *Baze*, which discussed the need to avoid "intrud[ing] on the role of state legislatures in implementing their execution procedures." 553 U. S., at 51; see also *ante*, at 13 (we owe "a measure of deference to a State's choice of execution procedures" (internal quotation marks omitted)). But no such intrusion problem exists in a case like this one. When adopting a method of execution, a state legislature will rarely consider the method's application to an individual who, like Bucklew, suffers from a rare disease. It is impossible to believe that Missouri's legislature, when adopting lethal injection, considered the possibility that it would cause prisoners to choke on their own blood for up to several minutes before they die. Exempting a prisoner from the State's chosen method of execution in these circumstances does not interfere with any legislative judgment.

The Court in *Glossip* may have also believed that the

identification of a permissible alternative method of execu-
tion would provide a reference point to assist in determin-
ing how much pain in an execution is too much pain. See
576 U. S., at \_\_\_–\_\_\_ (slip op., at 12–13); *Baze*, 553 U. S.,
at 47, 51 (plurality opinion); see also *ante*, at 15 (arguing
that determining the constitutionality of a method of
execution "is a *necessarily* comparative exercise").  But
there is no need for any such reference point in a case like
this.  Bucklew accepts the constitutionality of Missouri's
chosen execution method as to prisoners who do not share
his medical condition.  See Brief for Petitioner 36.  We are
informed that this method has been used in 20 executions,
apparently without subjecting prisoners to undue pain.
See Brief for Respondents 5.  To the extent that any com-
parator is needed, those executions provide a readymade,
built-in comparator against which a court can measure the
degree of excessive pain Bucklew will suffer.

 *Second*, precedent counsels against extending *Glossip*.
Neither this Court's oldest method-of-execution case,
*Wilkerson* v. *Utah*, 99 U. S. 130 (1879)*,* nor any subse-
quent decision of this Court until *Glossip*, held that pris-
oners who challenge a State's method of execution must
identify an alternative means by which the State may
execute them.  To the contrary, in *Hill* v. *McDonough*, 547
U. S.  573 (2006), the Court squarely and unanimously
rejected the argument that a prisoner must "identif[y] an
alternative, authorized method of execution."  *Id.*, at 582.
The Court noted that any such requirement would "change
the traditional pleading requirements for §1983 actions,"
which we were not at liberty to do.  *Ibid.*  It is thus diffi-
cult to see how the "alternative-method" requirement
could be "compelled by our understanding of the Constitu-
tion," *ante*, at 17, even though the Constitution itself never
hints at such a requirement, even though we did not apply
such a requirement in more than a century of method-of-
execution cases, and even though we unanimously rejected

such a requirement in *Hill*. And while the Court in *Glossip* did not understand itself to be bound by *Hill*, see *Glossip*, 576 U. S., at \_\_\_ (slip op., at 15) (distinguishing *Hill* on the theory that *Hill* merely rejected a heightened pleading requirement for §1983 suits), the two decisions remain in considerable tension. Confining *Glossip*'s "alternative method" requirement to facial challenges would help to reconcile them.

*Third*, the troubling implications of today's ruling provide the best reason for declining to extend *Glossip*'s "alternative method" requirement. The majority acknowledges that the Eighth Amendment prohibits States from executing prisoners by "'horrid modes of torture'" such as burning at the stake. *Ante*, at 10. But the majority's decision permits a State to execute a prisoner who suffers from a medical condition that would render his execution no less painful. Bucklew has provided evidence of a serious risk that his execution will be excruciating and grotesque. The majority holds that the State may execute him anyway. That decision confirms the warning leveled by the *Glossip* dissent—that the Court has converted the Eighth Amendment's "categorical prohibition into a conditional one." 576 U. S., at \_\_\_ (opinion of SOTOMAYOR, J.) (slip op., at 24).

## B

Even assuming for argument's sake that Bucklew must bear the burden of showing the existence of a "known and available" alternative method of execution that "significantly reduces a substantial risk of severe pain," *id.*, at \_\_\_ (majority opinion) (slip op., at 13) (alteration and internal quotation marks omitted), Bucklew has satisfied that burden. The record contains more than enough evidence on the point to raise genuine and material factual issues that preclude summary judgment.

Bucklew identified as an alternative method of execu-

tion the use of nitrogen hypoxia, which is a form of execution by lethal gas. Missouri law permits the use of this method of execution. See Mo. Rev. Stat. §546.720 (2002). Three other States—Alabama, Mississippi, and Oklahoma—have specifically authorized nitrogen hypoxia as a method of execution. See *ante,* at 22, n. 1. And Bucklew introduced into the record reports from Oklahoma and Louisiana indicating that nitrogen hypoxia would be simple and painless. These reports summarized the scientific literature as indicating that there is "no reported physical discom[fort] associated with inhaling pure nitrogen," App. 742, that the "onset of hypoxia is typically so subtle that it is unnoticeable to the subject," *id.*, at 745, and that nitrogen hypoxia would take an estimated "seventeen-to-twenty seconds" to render a subject unconscious, *id.,* at 746–747. The Oklahoma study concluded that nitrogen hypoxia is "the most humane method" of execution available. *Id.,* at 736. And the Louisiana study stated that the "[u]se of nitrogen as a method of execution can assure a quick and painless death of the offender." *Id.*, at 746.

How then can the majority conclude that Bucklew has failed to identify an alternative method of execution? The majority finds Bucklew's evidence inadequate in part because, in the majority's view, it does not show that nitrogen hypoxia will "significantly reduce" Bucklew's risk of pain as compared with lethal injection. *Ante*, at 23. But the majority does not dispute the evidence suggesting that nitrogen hypoxia would be "quick and painless" and would take effect in 20 to 30 seconds. The majority instead believes that "nothing in the record" suggests that lethal injection would take longer than nitrogen gas to take effect. *Ante*, at 26. As I have already explained, the majority reaches this conclusion by overlooking considerable evidence to the contrary—such as Dr. Zivot's testimony that Bucklew's pain would likely prove "prolonged," App.

234, that lethal injection would not "result in 'rapid unconsciousness,'" *id.*, at 233, and that from the time of injection to "Mr. Bucklew's death several minutes to as long as many minutes later, Mr. Bucklew would be highly likely to experience . . . the excruciating pain of prolonged suffocation," *id.*, at 222. In discounting this evidence, the majority simply fails "to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U. S., at 651 (internal quotation marks and alteration omitted).

The majority additionally believes that Bucklew's evidence fails to show that nitrogen hypoxia would be easy to implement. *Ante*, at 21. But the reports from Oklahoma and Louisiana tell a different story. The Louisiana report states that nitrogen hypoxia would be "simple to administer." App. 737. The Oklahoma report similarly concludes that "[d]eath sentences carried out by nitrogen inhalation would be simple to administer." *Id.*, at 746; see also *id.,* at 696. The reports explain that nitrogen hypoxia would "not require the use of a complex medical procedure or pharmaceutical products," *id.*, at 747, would "not require the assistance of licensed medical professionals," *id.*, 736, and would require only materials that are "readily available for purchase," *id.,* at 739. Further, "[b]ecause the protocol involved in nitrogen induced hypoxia is so simple, mistakes are unlikely to occur." *Id.*, at 748. And both studies recommend the development of protocols for actual implementation. See *id.,* at 697 (Oklahoma report recommending development of "a nitrogen hypoxia protocol"); *id.,* at 736 (Louisiana report noting that although "the exact protocol" has not been finalized, the report recommends "that hypoxia induced by the inhalation of nitrogen be considered for adoption"); see also Murphy, Oklahoma Says It Plans To Use Nitrogen for Executions, USA Today, Mar. 15, 2018 (quoting the Oklahoma attorney general's

statement that nitrogen "will be effective, simple to administer, easy to obtain and requires no complex medical procedures"); but cf. *ante*, at 21.

Presented with evidence such as Bucklew's, I believe a State should take at least minimal steps to determine the feasibility of the proposed alternative. The responsible state official in this case, however, acknowledged that he "did not conduct research concerning the feasibility of lethal gas as a method of execution in Missouri." *Id.,* at 713; see also Record in No. 14–800 (WD Mo.), Doc. 182–6, p. 16 (different official acknowledging that, "to be candid, no, I did not go out and try to find answers to those questions").

The majority sensibly recognizes that an inmate seeking to identify an alternative method of execution "is not limited to choosing among those presently authorized by a particular State's law." *Ante*, at 19. But the majority faults Bucklew for failing to provide guidance about the administration of nitrogen hypoxia down to the last detail. The majority believes that Bucklew failed to present evidence "on essential questions" such as whether the nitrogen should be administered "using a gas chamber, a tent, a hood, [or] a mask"; or "in what concentration (pure nitrogen or some mixture of gases)" it should be administered; or even how the State might "protec[t the execution team] against the risk of gas leaks." *Ante,* at 21.

Perhaps Bucklew did not provide these details. But *Glossip* did not refer to any of these requirements; today's majority invents them. And to insist upon them is to create what, in a case like this one, would amount to an insurmountable hurdle for prisoners like Bucklew. That hurdle, I fear, could permit States to execute even those who will endure the most serious pain and suffering, irrespective of how exceptional their case and irrespective of how thoroughly they prove it. I cannot reconcile the majority's decision with a constitutional Amendment that

forbids all "cruel and unusual punishments."  Amdt. 8.

## C

JUSTICE THOMAS concurs in the majority's imposition of an "alternative method" requirement, but would also permit Bucklew's execution on the theory that a method of execution violates the Eighth Amendment "'only if it is deliberately designed to inflict pain.'"  *Ante*, at 1 (concurring opinion) (quoting *Baze*, 553 U. S., at 94 (THOMAS, J., concurring in judgment)).  But that is not the proper standard.

For one thing, JUSTICE THOMAS' view would make the constitutionality of a particular execution turn on the intent of the person inflicting it.  But it is not correct that concededly torturous methods of execution such as burning alive are impermissible when imposed to inflict pain but not when imposed for a subjectively different purpose.  To the prisoner who faces the prospect of a torturous execution, the intent of the person inflicting the punishment makes no difference.

For another thing, we have repeatedly held that the Eighth Amendment is not a static prohibition that proscribes the same things that it proscribed in the 18th century.  Rather, it forbids punishments that would be considered cruel and unusual today.  The Amendment prohibits "unnecessary suffering" in the infliction of punishment, which this Court has understood to prohibit punishments that are "grossly disproportionate to the severity of the crime" as well as punishments that do not serve any "penological purpose."  *Estelle* v. *Gamble*, 429 U. S. 97, 103, and n. 7 (1976).  The Constitution prohibits gruesome punishments even though they may have been common at the time of the founding.  Few would dispute, for example, the unconstitutionality of "a new law providing public lashing, or branding of the right hand, as punishment . . . [e]ven if it could be demonstrated unequivo-

cally that these were not cruel and unusual measures in 1791." Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev. 849, 861 (1989). The question is not, as JUSTICE THOMAS maintains, whether a punishment is deliberately inflicted to cause unnecessary pain, but rather whether we would today consider the punishment to cause excessive suffering.

## III

Implicitly at the beginning of its opinion and explicitly at the end, the majority invokes the long delays that now typically occur between the time an offender is sentenced to death and his execution. Bucklew was arrested for the crime that led to his death sentence more than 20 years ago. And Bucklew's case is not an anomaly. The average time between sentencing and execution approaches 18 years and in some instances rises to more than 40 years. See *Glossip*, 576 U. S., at ___ (BREYER, J., dissenting) (slip op., at 18); *Reynolds* v. *Florida*, 586 U. S. ___, ___ (2018) (BREYER, J., statement respecting denial of certiorari) (slip op., at 2).

I agree with the majority that these delays are excessive. Undue delays in death penalty cases frustrate the interests of the State and of surviving victims, who have "an important interest" in seeing justice done quickly. *Hill*, 547 U. S., at 584. Delays also exacerbate the suffering that accompanies an execution itself. *Glossip*, 576 U. S., at ___–___ (BREYER, J., dissenting) (slip op., at 19–23). Delays can "aggravate the cruelty of capital punishment" by subjecting the offender to years in solitary confinement, and delays also "undermine [capital punishment's] jurisprudential rationale" by reducing its deterrent effect and retributive value. *Id.,* at ___, ___ (slip op., at 28, 32).

The majority responds to these delays by curtailing the constitutional guarantees afforded to prisoners like Buck-

lew who have been sentenced to death. By adopting elaborate new rules regarding the need to show an alternative method of execution, the majority places unwarranted obstacles in the path of prisoners who assert that an execution would subject them to cruel and unusual punishment. These obstacles in turn give rise to an unacceptable risk that Bucklew, or others in yet more difficult circumstances, may be executed in violation of the Eighth Amendment. Given the rarity with which cases like this one will arise, an unfortunate irony of today's decision is that the majority's new rules are not even likely to improve the problems of delay at which they are directed.

In support of the need to end delays in capital cases, the majority refers to *Dunn* v. *Ray*, 586 U. S. \_\_\_ (2019). In that case, the Court vacated a stay of execution on the ground that the prisoner brought his claim too late. The prisoner in that case, however, brought his claim only five days after he was notified of the policy he sought to challenge. See *id.,* at \_\_\_ (KAGAN, J., dissenting) (slip op., at 3). And in the view of some of us, the prisoner's claim—that prisoners of some faiths were entitled to have a minister present at their executions while prisoners of other faiths were not—raised a serious constitutional question. See *id.*, at \_\_\_ (slip op., at 2) (characterizing the Court's decision as "profoundly wrong"). And therein lies the problem. It might be possible to end delays by limiting constitutional protections for prisoners on death row. But to do so would require us to pay too high a constitutional price.

Today's majority appears to believe that because "[t]he Constitution allows capital punishment," *ante*, at 8, the Constitution must allow capital punishment to occur quickly. In reaching that conclusion the majority echoes an argument expressed by the Court in *Glossip*, namely, that "because it is settled that capital punishment is constitutional, it *necessarily follows* that there must be a

constitutional means of carrying it out."  576 U. S., at ___
(slip op., at 4) (emphasis added; alterations and internal
quotation marks omitted).

   These conclusions do not follow.  It may be that there is
no way to execute a prisoner quickly while affording him
the protections that our Constitution guarantees to those
who have been singled out for our law's most severe sanc-
tion.  And it may be that, as our Nation comes to place
ever greater importance upon ensuring that we accurately
identify, through procedurally fair methods, those who
may lawfully be put to death, there simply is no constitu-
tional way to implement the death penalty.

   I have elsewhere written about these problems.  See *id.*,
at ___–___ (BREYER, J., dissenting) (slip op., at 29–33).
And I simply conclude here that the law entitles Bucklew
to an opportunity to prove his claim at trial.  I note, how-
ever, that this case adds to the mounting evidence that we
can either have a death penalty that avoids excessive
delays and "arguably serves legitimate penological pur-
poses," or we can have a death penalty that "seeks reliabil-
ity and fairness in the death penalty's application" and
avoids the infliction of cruel and unusual punishments.
*Id.*, at ___ (slip op., at 32).  It may well be that we "cannot
have both."  *Ibid.*

*      *      *

   I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–8151

_____

## RUSSELL BUCKLEW, PETITIONER *v.* ANNE L. PRECYTHE, DIRECTOR, MISSOURI DEPARTMENT OF CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 1, 2019]

JUSTICE SOTOMAYOR, dissenting.

As I have maintained ever since the Court started down this wayward path in *Glossip* v. *Gross*, 576 U. S. \_\_\_ (2015), there is no sound basis in the Constitution for requiring condemned inmates to identify an available means for their own executions. JUSTICE BREYER ably explains why today's extension of *Glossip*'s alternative-method requirement is misguided (even on that precedent's own terms), and why (with or without that requirement) a trial is needed to determine whether Missouri's planned means of executing Russell Bucklew creates an intolerable risk of suffering in light of his rare medical condition. I join JUSTICE BREYER's dissent, except for Part III. I write separately to address the troubling dicta with which the Court concludes its opinion.

I

Given the majority's ominous words about late-arising death penalty litigation, *ante,* at 29–30, one might assume there is some legal question before us concerning delay. Make no mistake: There is not. The majority's commentary on once and future stay applications is not only inessential but also wholly irrelevant to its resolution of any issue before us.

The majority seems to imply that this litigation has been no more than manipulation of the judicial process for the purpose of delaying Bucklew's execution. *Ante,* at 29. When Bucklew commenced this case, however, there was nothing "settled," *ibid.*, about whether the interaction of Missouri's lethal-injection protocol and his rare medical condition would be tolerable under the Eighth Amendment. At that time, *Glossip* had not yet been decided, much less extended to any as-applied challenge like Bucklew's. In granting prior stay requests in this case, we acted as necessary to ensure sufficient time for sober review of Bucklew's claims. The majority laments those decisions, but there is nothing unusual—and certainly nothing untoward—about parties pressing, and courts giving full consideration to, potentially meritorious constitutional claims, even when those claims do not ultimately succeed.

## II

I am especially troubled by the majority's statement that "[l]ast-minute stays should be the extreme exception," which could be read to intimate that late-occurring stay requests from capital prisoners should be reviewed with an especially jaundiced eye. See *ante,* at 30. Were those comments to be mistaken for a new governing standard, they would effect a radical reinvention of established law and the judicial role.

Courts' equitable discretion in handling stay requests is governed by well-established principles. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). Courts examine the stay applicant's likelihood of success on the merits, whether the applicant will suffer irreparable injury without a stay, whether other parties will suffer substantial injury from a stay, and public interest considerations. *Ibid.*

It is equally well established that "[d]eath is a punishment different from all other sanctions in kind rather than

degree." *Woodson* v. *North Carolina*, 428 U. S. 280, 303–304 (1976). For that reason, the equities in a death penalty case will almost always favor the prisoner so long as he or she can show a reasonable probability of success on the merits. See *Nken*, 556 U. S., at 434 (noting that success on the merits and irreparable injury "are the most critical" factors); cf. *Glossip*, 576 U. S., at \_\_\_ (slip op., at 11) (observing, in a preliminary-injunction posture, that "[t]he parties agree that this case turns on whether petitioners are able to establish a likelihood of success on the merits" and analyzing the case accordingly); accord*, id.*, at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 22). This accords with each court's "'duty to search for constitutional error with painstaking care'" in capital cases. *Kyles* v. *Whitley*, 514 U. S. 419, 422 (1995).

It is of course true that a court may deny relief when a party has "unnecessarily" delayed seeking it, *Nelson* v. *Campbell*, 541 U. S. 637, 649–650 (2004), and that courts should not grant equitable relief on clearly "'dilatory,'" "'speculative,'" or meritless grounds, *ante*, at 31 (quoting *Hill* v. *McDonough*, 547 U. S. 573, 584–585 (2006)); see also *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*) (vacating a stay where an inmate's unjustified 10-year delay in bringing a claim was an "obvious attempt at manipulation"). That is hardly the same thing as treating late-arising claims as presumptively suspect.[1]

––––––––

[1] A skewed view of the facts caused the majority to misapply these principles and misuse its "equitable powers," see *ante,* at 30, and n. 5, in vacating the Court of Appeals' unanimous stay in *Dunn* v. *Ray*, 586 U. S. \_\_\_ (2019). Even today's belated explanation from the majority rests on the mistaken premise that Domineque Ray could have figured out sooner that Alabama planned to deny his imam access to the execution chamber. But see *id.,* at \_\_\_ (KAGAN, J., dissenting) (slip op., at 3) (noting that the governing statute authorized both the inmate's imam and the prison's Christian chaplain to attend the execution, and that "the prison refused to give Ray a copy of its own practices and

The principles of federalism and finality that the majority invokes are already amply served by other constraints on our review of state judgments—most notably the Antiterrorism and Effective Death Penalty Act of 1996, but also statutes of limitations and other standard filters for dilatory claims. We should not impose further constraints on judicial discretion in this area based on little more than our own policy impulses. Finality and federalism need no extra thumb on the scale from this Court, least of all with a human life at stake.

The only sound approach is for courts to continue to afford each request for equitable relief a careful hearing on its own merits. That responsibility is never graver than when the litigation concerns an impending execution. See, *e.g., Kyles*, 514 U. S., at 422; *Woodson*, 428 U. S., at 303–304. Meritorious claims can and do come to light even at the eleventh hour, and the cost of cursory review in such cases would be unacceptably high. See *Glossip*, 576 U. S., at \_\_\_–\_\_\_ (BREYER, J., dissenting) (slip op., at 21–22) (collecting examples of inmates who came "within hours or days of execution before later being exonerated"). A delay, moreover, may be entirely beyond a prisoner's control. Execution methods, for example, have been moving targets subject to considerable secrecy in recent years, which means that constitutional concerns may surface only once a State settles on a procedure and communicates its choice to the prisoner.[2] In other contexts, too, fortuity

———————

procedures" that would have clarified the two clergymen's degrees of access); *Ray* v. *Commissioner, Ala. Dept. of Corrections*, 915 F. 3d 689, 701–703 (CA11 2019).

[2] See *Zagorski* v. *Parker*, 586 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (SOTOMAYOR, J., dissenting from denial of application for stay and denial of certiorari) (slip op., at 2–3) (describing Tennessee's recent equivocation about the availability of its preferred lethal injection protocol); *Glossip*, 576 U. S., at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 29) (noting States' "scramble" to formulate "new and untested" execution methods); *Sepulvado* v. *Jindal*, 739 F. 3d 716, 717–718 (CA5 2013) (Dennis, J.,

or the imminence of an execution may shake loose consti-
tutionally significant information when time is short.[3]

There are higher values than ensuring that executions
run on time. If a death sentence or the manner in which it
is carried out violates the Constitution, that stain can
never come out. Our jurisprudence must remain one of
vigilance and care, not one of dismissiveness.

———————

dissenting from denial of rehearing en banc) (describing Louisiana's
refusal to inform a prisoner of the drugs that would be used to execute
him); Denno, Lethal Injection Chaos Post-*Baze*, 102 Geo. L. J. 1331,
1376–1380 (2014) (describing increased secrecy around execution
procedures).

[3] See *Connick* v. *Thompson*, 563 U. S. 51, 55–56, and n. 1 (2011) (in-
tentionally suppressed exculpatory crime lab report discovered a month
before a scheduled execution); *Ex parte Braziel*, No. WR–72,186–01
(Tex. Crim. App., Dec. 11, 2018), pp. 1–2 (Alcala, J., dissenting) (disclo-
sure by the State of "new information about possible prosecutorial
misconduct" the same day as an execution).